# United States Court of Appeals

Eleventh Circuit

56 Forsyth Street, N.W.
Atlanta, Georgia  30303

**Thomas K. Kahn**
Clerk

For rules and forms visit
www.ca11.uscourts.gov

FILED by ___ Digital Docket
RECORDS

November 29, 2005

REC'D by _H·H_ · D.C.
APPEALS

JAN 2 3 2006

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

Clarence Maddox
Clerk, U.S. District Court
301 N MIAMI AVE STE 150
MIAMI FL  33128-7788

FEB 0 3 2006

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

**Appeal Number: 05-10697-FF**
Case Style: Sandra E. Van Der Meulen v. Brinker Int'l
District Court Number:  03-61722 CV-WPD

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued
as the mandate of this court.

Also enclosed are the following:
   Original Exhibits, consisting of: one folder, one envelope
   Original record on appeal or review, consisting of: one volume

The district court clerk is requested to acknowledge receipt on the copy of this letter enclosed
to the clerk.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being mailed to counsel and pro se parties. A copy of the court's decision
was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: James O. Delaney (404) 335-6113

Encl.

MDT-1 (03-2004)

# United States Court of Appeals
## For the Eleventh Circuit

No. 05-10697

District Court Docket No.
03-61722-CV-WPD

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Oct 31, 2005

THOMAS K. KAHN
CLERK

SANDRA E. VAN DER MEULEN,

Plaintiff-Appellant,

versus

BRINKER INTERNATIONAL,
d.b.a. Chili's Restaurant,

Defendant-Appellee.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

------------------------------------------------
Appeal from the United States District Court
for the Southern District of Florida
------------------------------------------------

## JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

ISSUED AS MANDATE
NOV 2 9 2005
U.S. COURT OF APPEALS
ATLANTA, GA.

Entered: October 31, 2005
For the Court: Thomas K. Kahn, Clerk
By: Gilman, Nancy

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

<table>
<tr><td>**FILED**</td></tr>
<tr><td>**U.S. COURT OF APPEALS**<br>**ELEVENTH CIRCUIT**</td></tr>
<tr><td>**October 31, 2005**</td></tr>
<tr><td>**THOMAS K. KAHN**<br>**CLERK**</td></tr>
</table>

No. 05-10697
Non-Argument Calendar

D. C. Docket No. 03-61722-CV-WPD

SANDRA E. VAN DER MEULEN,

Plaintiff-Appellant,

versus

BRINKER INTERNATIONAL,
d.b.a. Chili's Restaurant,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Florida

**(October 31, 2005)**

Before BIRCH, BLACK and PRYOR, Circuit Judges.

PER CURIAM:

Sandra Van der Meulen, a former employee of Brinker International, d.b.a.

Chili's Restaurant ("Chili's"), appeals the grant of summary judgment for Chili's on her claim that Chili's retaliated against her for complaining about sexual harassment in violation of 42 U.S.C. § 2000e-2(a)(1).  She argues that her supervisor's threats constituted an adverse employment action and that her supervisor's threats, combined with the work environment, constituted constructive discharge.  The adverse employment action claim was not preserved for appeal and also fails as a matter of law.  The constructive discharge claim fails because Van der Meulen did not present evidence that would show that the environment was so intolerable that a reasonable person would be compelled to resign.  The district court's grant of summary judgment is, therefore, AFFIRMED.

## I. BACKGROUND

Van der Meulen, a female, filed a complaint in Florida state court alleging that her former employer, Chili's, retaliated against her for complaining about sexual harassment under the Florida Civil Rights Act, Fla. Stat. §§ 760.01-.11 ("FCRA").  Van der Meulen alleged, inter alia, that while she was employed at Chili's as a mid-manager/server, her immediate supervisor, Brian Marks, subjected her to a sexually hostile environment and discriminated against her based on her gender.  R1-1 at Exh. A, Complaint at 2-3. She also alleged that Chili's had retaliated against her because she objected to Marks's treatment and that she was

2

constructively discharged. She claimed that she suffered emotional anguish and distress as a result of the treatment and sought compensatory and punitive damages.

Chili's removed the case to federal court and, in answer to the complaint, denied that it had discriminated or retaliated against, or harassed Van der Meulen. Following discovery, Chili's moved for summary judgment. It argued that Van der Meulen's retaliation claim failed because she quit before she had given Chili's an opportunity to work through any issues, and because the circumstances were not sufficient to compel a reasonable person to resign. It maintained that a reasonable person would have found Chili's general manager, Andy York, and his boss, Tony Viola, responsive to her complaints and that they had been responsive to Marks's previous remarks. In support of their motion, Chili's submitted Van der Meulen's deposition, York and Viola's sworn declarations, and other exhibits.

In her deposition, Van der Meulen testified that, after she began working for Chili's in 2000, she was promoted to a "key employee", in which she assisted a night restaurant manager. R1-24 at 54. She was told by York, in May 2002, that she was one of the best key employees in the restaurant, and she responded that she was interested in a management position and gave him her resume. She was subsequently scheduled for more key employee shifts but was unaware of any

3

available management positions at the restaurant where she was employed.

Van der Meulen said that Marks began working for Chili's during 2002. She said that, while she was waiting for food at the kitchen pass-through in May, Marks made "sexual" comments to the cook about "doing your mother" while looking at Van der Meulen. Id. at 111-12. She said that she told Marks that she was offended by the remark, but he just ignored her and she did not report the incident to York. Sometime in late May or early June, Marks told Van der Meulen that he had previously worked as a stripper and began doing a "strip tease kind of dance" with "all kinds of thrusts." Id. at 109, 116-20, 122-23. Van der Meulen reported this episode to one of the other managers, Bill Cook, who told her that he would handle it.

On 14 June 2002, Van der Meulen stated that she was working a key employee shift and asked Marks what they were going to do about lunch for the employees, because it was customary for managers to make lunch for the employees on Fridays. When she asked about the lunch plans, she found Marks in the manager's office with another employee, Michael Creech. In response to Van der Meulen's question, Marks said "Deez nuts," under his breath, and Creech started laughing. Id. at 126-28. She asked him again what they were having for lunch, and Marks looked at her and repeated "Deez nuts." Id. at 127. She asked

4

him a third time, and he pointed to his groin area, thrust it out, and again said "Deez nuts." Id. at 127-28, 150-51.

Van der Meulen testified that she left the office, started crying, and went to the bathroom to compose herself. Two of the other servers joined Van der Meulen at the bathroom to check on her and she told them what had happened. She said that Marks's comment and gesture made her feel hurt, angry, offended, and betrayed, and that Creek's laughter made her feel inferior because he was laughing at her when she was supervising him. She stayed in the bathroom for about 15 minutes and then came out and told Marks that she needed to talk to him outside. After they both went outside, she told him that what he had done was wrong, that he should be ashamed of himself, and that she was hurt and offended. Marks apologized and she went back to work and finished her shift.

In her deposition, Van der Meulen admitted that she did not report this incident to York, but noted that the next time she saw York, he asked her to come into his office and told her that he had found out that Marks had done something inappropriate and that he needed to report it to his boss, Viola, to cover himself. She told York that he "ha[d] to do what [he] ha[d] to do", and then his demeanor changed, and he said "I got to tell you, if you report this, your chances of going to management is going to be very slim. Who is going to want to work with someone

who screams sexual harassment? What manager is going to want to work with you?" Id. at 136. She felt betrayed by his statement which she believed implied he had a choice about reporting the incident and that, if she reported it, her chances of going into management would be affected. Later, York called her, told her Viola was available, and asked her if she wanted to speak with Viola. She didn't know what to say and told him she needed to think about it. When Van der Meulen returned to work, York told her that they would not "talk about this," and Van der Meulen agreed, because there were rumors running around the restaurant. Id. at 147.

Van der Meulen admitted that, during the time between the 14 June incident, and when she quit, about three weeks later, Marks did not direct any inappropriate behavior or language toward her. Marks never touched her inappropriately or physically threatened her. Nevertheless, Van der Meulen testified that, after her conversation with York, she was not scheduled for as many key shifts as before, the issue of her going into management was avoided, and the managers no longer had time to show her things on her free time. She also felt that York withheld her resume from management consideration. She did not know of any management positions that became available while she was working at Chili's.

According to Van der Meulen, about three weeks after 14 June, one of the

servers told her that Marks had warned him not to talk to her because she had claimed sexual harassment. On that day, Marks was in the restaurant, drinking in the dining room and talking with other employees. Another employee, Jen Kieser, told her that Marks was talking about the 14 June incident. Van der Meulen finished her shift and then informed the manager on duty that she quit. She testified that she quit because the issue had not been "dropped [,] wasn't being investigated," and because the male servers at the restaurant had formed a "good old boy[s] network" that continued to focus on her reaction to the incident with Marks. Id. at 162-63. Her continued reaction to the 14 June incident also played a role in her decision to quit.

Van der Meulen acknowledged that York called her at home the next morning to ask if there was anything he could do, but she told him she was still upset and to call back. Viola called Van der Meulen the following day, and told her that he needed to take a report over the phone. He asked her if she wanted to come back to the restaurant, but she stated that she could not work there if the same people were still there. Viola asked her if she wanted to work at the Port St. Lucie restaurant, but she said it was too far to drive for the money that she would be paid. She testified that, although she would have accepted a management position at the Port St. Lucie store, she did not talk to Viola about such a position.

Van der Meulen claimed that when she left Chili's she was "emotionally distraught." Id. at 43. She said that she did not see a psychiatrist, psychologist, or a mental health therapist because she could not afford it, but testified that she talked to her pastor twice about the events. She stated she did not want to return to employment at Chili's, even though both York and Marks no longer worked there.

York stated in his declaration that, upon investigating the 14 June incident, he determined that Marks had acted inappropriately and contrary to Chili's guidelines and policies when he made an inappropriate comment to Van der Meulen. Viola declared that he had learned of the incident from York. York and Viola both stated in their declarations that York had prepared a summary of the incident that was signed by York, Marks, and Viola; counseled Marks regarding proper behavior; and given Marks a written warning for violating Chili's policies. York said that Van der Meulen did not complain to him about any inappropriate behavior by Marks between the time of the incident and Van der Meulen's resignation.

In opposition to the motion for summary judgment, Van der Meulen argued that she was constructively discharged and that Chili's did not attempt to rectify the situation, but rather caused her to quit by making her "the troublemaker" and keeping Marks employed, even after another manager, Bill Cook, labeled Marks "a

sexual harassment risk." R1-29 at 13.  She maintained that she suffered the

adverse employment action of constructive discharge and that the causal link

between her  complaint and her discharge was York's statements "that her

complaint w[ould] hurt her chances to go into management, that no one would

want to work with her," and the subsequent reduction in her key employee shifts.

Id. at 12-13.  She did not specifically argue that York's statements were a separate,

actionable adverse employment action.  She stated that she was bringing her action

against Chili's under Title VII, apparently for the first time, and under the FCRA.

In support, she filed the depositions of former Chili's employee Kieser  and

manager Bill Cook.

Kieser testified during her deposition that she worked as a server and key

employee at Chili's.  She stated that Marks "was always hitting on the younger

[female employees]", and making "sexual comments" about their bodies and the

way that they were dressed.  R1-30, Kieser Depo. at 9-12.  One night, Marks

invited some employees over to his house and showed them pornography on his

TV.  Kieser testified that she heard Marks tell people about the 14 June incident

with Van der Meulen, and that eventually, everyone at Chili's restaurant was aware

of the incident.  A few days after the June 14 incident, Kieser was at a bar with

Van der Meulen, and the bartender asked Van der Meulen  if she was the "these

9

nuts" girl. Id. at 19. Finally, Kieser noted that, on the day that Van der Meulen quit, Marks, who was visiting the Chili's bar as a guest, was drinking with some other Chili's employees. Marks was talking so loudly and using such foul language that Kieser asked him to stop. When Marks continued with his offensive behavior, Kieser asked a manager to intervene and Marks subsequently left.

By deposition, Cook testified that he had worked for Chili's as an assistant general manager. He felt that Marks "was a sexual harassment risk" and notified his superiors, including Viola, of his concerns. Id. at 10-11, 17. He observed that Marks's choice of words and vocabulary was improper and that he inappropriately touched female employees. Four female bartenders and other employees complained to him about Marks's comments and behavior toward them. Cook said that he had heard that Van der Meulen had complained about an incident involving Marks. Van der Meulen also submitted excerpts from Marks's personnel file, documenting the 14 June incident, at Chili's.

In reply to Van der Meulen's response to summary judgment, Chili's did not object to Van der Meulen's characterization of her case as raising Title VII claims.

The district court granted summary judgement in favor of Chili's. Referring to Title VII, the court found that a hostile work environment did not exist as a matter of law and that Van der Meulen's retaliation claim failed because there was

10

no adverse employment action or constructive discharge.  Specifically, the court found that no adverse employment action occurred  because her subjective allegation of not receiving as many key assignments as she had previously was not substantial enough, and because she did not show that there was a management opening that she could have been considered for while employed by Chili's.  The court further found that the working conditions did not rise to the level of being so intolerable as to constitute a constructive discharge, especially in light of Chili's remedial efforts post-termination.  The district court did not explicitly rule on Van der Meulen's claims under the FCRA, but implicitly granted summary judgment on these claims as well.  Van der Meulen's motion for reconsideration was denied.

On appeal, Van der Meulen argues that she presented evidence to show that Chili's retaliated against her by threatening her promotional potential and constructively discharged her through the threats and a hostile work environment.

## II. DISCUSSION

We review the grant of summary judgment <u>de novo</u>, viewing the evidence in the light most favorable to the nonmoving party.  <u>Johnson v. Governor of Fla.</u>, 405 F.3d 1214, 1217 (11th Cir. 2005) (en banc).  Summary judgment should be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

11

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

"Title VII makes it an unlawful employment practice for an employer . . . to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." Walton v. Johnson & Johnson Serv., Inc., 347 F.3d 1272, 1279 (11th Cir. 2003) (per curiam) (internal quotation omitted); see also 42 U.S.C. §§ 2000e-2(a)(1). It is also unlawful for an employer to discriminate against an employee because she has opposed an unlawful employment practice. 42 U.S.C. §§ 2000e-3(a).

"To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). To prove that an adverse employment action has taken place, "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment" that is "materially adverse as viewed by a reasonable person in the circumstances." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001). "[T]he action must either be an ultimate employment decision or else must meet some threshold level of substantiality." Stavropoulos v. Firestone, 361 F.3d

12

610, 616-17 (11th Cir. 2004), cert. denied, __ U.S. __, 125 S. Ct. 1850 (2005) (internal quotation omitted). "Constructive discharge qualifies as an adverse employment decision." See Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 n.2 (11th Cir. 1997).

A. York's statements as an adverse employment action

Van der Meulen argues that she presented evidence from which a reasonable fact finder could conclude that Chili's retaliated against her by threatening her regarding her promotional potential if she reported the sexual harassment, specifically through York's threat that, if she reported Marks's inappropriate conduct, her chances of going to management were going to be slim and that no one would want to work with her, and York's subsequent phone call asking her if she wanted to pursue the report any further.

As an initial matter, Van der Meulen did not properly preserve this issue for appeal. Although Van der Meulen referred to York's comments, she never argued in her complaint, in opposition to summary judgment, or on reconsideration, that his comments, standing alone, constituted an adverse employment action but that the comments were part of the circumstances constituting her constructive discharge. The district court cited York's statements when discussing Van der Meulen's constructive discharge claim, but did not address whether York's

13

comments constituted an adverse employment action separately.  R1-33 at 6-7.

Generally, we do not consider an issue or theory on appeal that was not raised in the district court.  Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004); see Algernon Blair Group, Inc. v. United States Fid. and Guar. Co., 821 F.2d 597, 602-03 (11th Cir. 1987) (confirming that factual assertions presented for the first time on appeal could not be used to defeat summary judgment, even where the facts were in the record at the time of summary judgment).

To the extent that the issue is not waived, the claim still fails, because York's "threat" did not amount to an adverse employment action.  In Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1448-51 (11th Cir. 1998) (discussing the ADA), we recognized that the test for adversity should be objective, and that an employee's subjective feelings about an employer's actions should not be considered.  Even accepting Van der Meulen's testimony, there is no objective basis for finding York's statements constituted an adverse employment action. York made only one "threatening" statement to Van der Meulen that her chances of going into management might be affected if she reported the incident.  See R1-24 at 134-43, 146-49.  This statement did not cause any objective change in her employment.  She worked for three weeks after the threatening statement,

14

acknowledged that she and York agreed not to discuss the incident further, and does not claim that York or anyone else at Chili's threatened her further. See id. Van der Meulen does not argue that she suffered a cut in pay or any change in her benefits or position.[1] She acknowledged that no management positions became available while she was working at Chili's, and that both York and Viola attempted to get her to come back to work after she quit. Id. at 91-92, 168-172, 175, 178.

Additionally, Van der Meulen did not complain about or report the alleged threats to another Chili's manager, even when she was given a chance to talk to Viola on the phone after the threats. Thus, Chili's had no time to remedy the situation. Id. at 144. See, e.g., Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1364-66 (11th Cir. 1999) (per curiam) (holding that a hostile work environment plaintiff must notify the employer of the harassment and give the employer a chance to remedy the situation). Further, although Van der Meulen likens her case to Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453 (11th Cir. 1998), in which we held that adverse actions falling short of ultimate employment decisions can be actionable under Title VII, we recognized, but did not establish, a level of substantiality that must be met for unlawful discrimination to be cognizable under

---

[1] Van der Meulen testified that she was scheduled for fewer key employee shifts after York's threat; however, she does not argue on appeal that this change in her schedule was an adverse employment action. See R1-24 at 174-75.

15

the anti-retaliation clause. Id. at 1456. In Wideman, we concluded that the actions of which Wideman had complained were collectively sufficient to constitute prohibited behavior. Id. Those actions included improperly listing her as a no-show on a day she was scheduled off, and requiring her to work when she brought the error to the attention of her supervisor; giving her written reprimands, for the first time in eleven months, which resulted in a one-day suspension; soliciting employees for negative comments on her performance; failing to schedule her for work; threatening to shoot her in the head; and delayed authorizing medical treatment for an allergic reaction she was having. Id. at 1455, 1456. Van der Meulen only alleged one statement made threatening her future management aspirations, and she was not suspended, given a formal reprimand, harassed or threatened after her first meeting with York, and did not have her schedule reduced. The adverse action alleged by Van der Meulen is highly insubstantial in comparison to the misconduct alleged in Wideman. Although she may have been emotionally distraught over York's comments regarding her future management potential, the record shows that these comments had no real effect on her employment, and thus, did not constitute an adverse employment action.

B. Evidence of constructive discharge

16

Van der Meulen also argues that York's threats, combined with Marks's continued drunken ranting about the incident, and other employees coming up to her and telling her that Marks was discussing the incident, created an environment where a reasonable person in her position would have felt compelled to resign. She contends that her key employee duties were reduced and signaled that her chance of a management position had been derailed, and that it is a disputed issue of material fact as to whether the efforts Chili's took to rectify the situation were transparent since Marks remained employed.

"A constructive discharge occurs when a discriminatory employer imposes working conditions that are so intolerable that a reasonable person in the employee's position would have been compelled to resign. Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 977 (11th Cir. 2003) (citation and internal quotation marks omitted). Because the standard of proof for a constructive discharge claim is higher than that for a hostile work environment claim, the plaintiff must show more than that she was subjected to actionable harassment. Walton, 347 F.3d at 1282. "A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation." Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996) (affirming summary judgment where the employer began an investigation of the plaintiffs'

complaint on a Friday and attempted to meet with the plaintiffs on the following Tuesday, and where the plaintiffs did not return to work after advising the employer of their complaints). "Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987) (affirming summary judgment where the employee quit after one day in what she perceived as an unacceptable position).

In Fitz, 348 F.3d at 979, we upheld summary judgment for the employer where the plaintiff claimed that his employer's racial discriminatory conduct compelled him to resign. One of the facts used by the plaintiff to support his position was his co-workers statements that his employer planned to fire him because of his race sometime in the future. Id. at 978. Noting that the plaintiff never confronted his employer about the alleged plot, we "decline[d] to reach a holding that would encourage speculative litigation" since the employer might "never carry out the plan." Id. at 978 & n.4. In contrast, we reversed the grant of summary judgment for the employer in the constructive discharge claim in Poole where the employee was relieved of all of her duties, moved to an office with only a chair and no desk, and her employer instructed other employees not to speak with her. Poole, 129 F.3d at 552, 553.

18

The working conditions that Van der Meulen argues were intolerable consist of York's statement that her promotional potential would be negatively effected if she reported the sexual harassment and a coworker's statement, three weeks later, that Marks was in the Chili's bar talking about the incident in which he made the "Deez nuts" comment and inappropriately gestured toward her. Although she claims that the environment was such that a reasonable person would feel compelled to resign, she specifically testified that no sexual harassment occurred between her first conversation with York about Marks's harassment and the day that she quit and that she quit because the issue had not been dropped and she felt it was not being investigated. The evidence, however, including documentation filed by Van der Meulen, indicates that Marks's inappropriate comments and behavior were investigated and Marks was reprimanded for the inappropriate comment he made to her on 14 June. R1-24 at 164-65, Exh. 8.

The actions taken by Chili's when made aware of Marks's inappropriate behavior appear successful, in that Van der Meulen admittedly suffered no further harassment. Although she was upset over hearing that Marks was still discussing the incident with other employees, she did not return to work after becoming aware that Marks was discussing the incident. Under the circumstances, she acted unreasonably in quitting without giving Chili's an opportunity to respond, as they

19

had successfully done previously.  Her constructive discharge claim amounts to two isolated incidents, three weeks apart.  Her case is akin to the claims in Fitz, in that her employer's threats never materialized.  She was never denied the opportunity to advance to a management position, and in fact, Chili's managers attempted to mend the employment relationship after she quit.  Under these circumstances, a reasonable person would not have felt compelled to resign.

### III. CONCLUSION

Van der Meulen failed to establish a retaliation claim as a matter of law.  She never argued in the district court that her supervisor's threat constituted an adverse employment action, but even assuming this argument is properly preserved, the threat was never carried out, and did not objectively change any of the terms and conditions of her employment such that it can be considered an adverse employment action.  Even combined with her other complaints about the work environment, a reasonable person would not have felt compelled to resign, especially in light of Chili's previous successful measures to stop the harassment, and the fact that she never gave Chili's the opportunity to remedy the final incident she claims compelled her to resign.

**AFFIRMED.**

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

20